ERYIN, Chief Judge.
In this workers’ compensation appeal, the employer/carrier appeal an order awarding appellee, claimant, catastrophic loss benefits pursuant to Section 440.-15(2)(b), Florida Statutes (1983). We reverse.
While working at a construction site on June 24, 1983, claimant fell approximately ten feet from a wall to a concrete floor. He injured his head and lost all feeling in both arms. Employer/carrier paid temporary total disability until March 15, 1984, and thereafter temporary partial disability benefits, but controverted claimant’s claim for catastrophic loss benefits.
In September 1983, and still without any strength in his arms, claimant sought the help of Dr. Dale K. Johns, a board certified neurosurgeon. Dr. Johns initially found intermittent spinal cord compression and spinal instability in the cervical area, and he performed two operations on claimant in September and October 1983: a bilateral decompressive laminectomy, and an anteri- or cervical fusion. Claimant testified that six weeks after the operations, he began gradually to regain strength in his arms, but three fingers on each hand remained numb. Three months after the operations, he could perform only simple chores at home and could not return to construction work.
*402 As of February 29, 1984, Dr. Johns believed that claimant’s continued complaints of pain, weakness and numbness were primarily orthopedic in nature. Upon claimant’s last visit to Dr. Johns' on April 27, 1984, the latter could not find a neurological explanation for claimant’s complaints and approved claimant’s return to work with the following restrictions: no heavy construction work, no heavy lifting, and no working at heights. Regarding the existence of any neurological damage, Dr. Johns testified in pertinent part:
[Q] Did the claimant have a neurological lesion?
A No. On neurological examination what he had was an unstable neck.
When he walked in here he was using all his arms and legs. He did have evidence of some nerve root pressure when he would bend his head forward, because he would get a stinging sensation into his arms and legs. That meant that he was putting a little pressure on the spinal cord; but neurologically when I examined him he did not have motor weakness or reflex changes or evidence of a permanent neurological lesion. Obviously he could not work.
If you say, “Can he do industrial work,” no, he could not do any kind of work. If you walk around with a neck that is unstable, you are not a candidate to work, you have to be in a hospital and have it repaired. That is why we put this guy in and had that done, because potentially that is a very serious problem ....
Q But you did do some work involving the nerves in his spine; is that correct?
A No, sir, I never touched his nerves. We decompressed his spine from the back, meaning that we took the bone off or the lamina away from the nerves. I never actually worked with the nerves myself.
We then fused the bone from the front, to make his neck solid.
The deputy’s order awards catastrophic loss benefits at the rate of $400 per week from June 24, 1983 and continuing for 26 weeks, less any amounts already paid out during that period, plus interest. After finding that claimant was “totally incapacitated for any work for six months subsequent to his accident”, the deputy’s order states:
Although ... Dr. Johns ... testified that the claimant suffered no organic damage to the nervous system, per se, it is unquestioned that as a result of the claimant’s accident, he suffered an injury which produced an unstable neck. As a result of that accident, the claimant was unable to use his arms, drive a car or do any kind of activity. According to the claimant, whose testimony I accept, subsequent to his surgery on September 29, 1983, he still did not regain use of his arms until approximately March, 1984. It is patently obvious that the injury to the claimant’s neck and his subsequent surgery produced the problems in his arms. Therefore, I find that the claimant did, in fact, suffer trauma and damage to his nervous system as a direct result of his injury and it was an additional five to six months subsequent to his surgery before he began regaining the use of his arms and hands. See Marriott In-Flight [sic] Services v. Sergio Garcia, ... [450 So.2d 569 (Fla. 1st DCA 1984)]. Accordingly, I find that the claimant is entitled to catastrophic loss benefits....
(emphasis in original)
Section 440.15(2)(b), Florida Statutes (1983), states in pertinent part: “[A]n employee who has sustained the loss of an arm, leg, hand, or foot, or total loss of use of such member because of organic damage to the nervous system, ... shall be paid temporary total disability of 80 percent of his average weekly wage_” (e.s.) Whether the loss of use of one or both arms is the result of organic damage to the nervous system is a factual issue for the deputy. Hernandez v. Equipment Company of America, Adjusto, Inc., 452 So.2d 85, 86 (Fla. 1st DCA 1984). “[T]he claimant must demonstrate (1) the total loss of use of an *403 arm (2) because of organic damage to the nervous system. Seminole County Board of County Commissioners v. Chaplin, 460 So.2d 544, 545 (Fla. 1st DCA 1984) (emphasis in original). Regarding the first requirement, the claimant here was required to prove “the inability to perform functions required in an industrial setting considered in light of the use which ... [he] must reasonably make of ... [his arms] in his employment.” Atlantic Plastering, Inc. v. O’Hara, 454 So.2d 743, 744 (Fla. 1st DCA 1984). The unrefuted testimony of claimant and Dr. Johns constitutes competent, substantial evidence to support the deputy’s finding that claimant’s injury “totally incapacitated” him from doing construction work for six months.
Moving to the second requirement, loss of use of an arm or arms “because of organic damage to the nervous system must be established by medical evidence.” Seminole County, 460 So.2d at 545. The medical evidence here consists of Dr. Johns’ deposition and his file on claimant. Dr. Johns testified that his examinations of claimant revealed no motor weakness, reflex changes or evidence of a “neurological lesion.” Since “lesion” is defined as “a wound or injury”, American Heritage Dictionary 750 (New College ed. 1976), or “[d]amage; injury; detriment; sore; wound”, Black’s Law Dictionary 812 (5th ed. 1979), the clear inference from Dr. Johns’ testimony is that claimant’s accident resulted in no “organic damage to the nervous system”.
Moreover, Dr. Johns testified that while treating and performing surgery on claimant, he never touched or worked with any of claimant’s nerves. Thus, Marriott In-Flite Services v. Garcia, 450 So.2d 569 (Fla. 1st DCA 1984), is distinguishable from the case at bar. In Marriott, this court affirmed an award of catastrophic loss benefits after finding that claimant had suffered damage to his nervous system as a result of treatment of an industrial injury. Specifically, during surgery to the claimant’s injured shoulder, nerves were necessarily cut as torn muscles were repaired.
In the case at bar, there is no evidence that any nerves were affected during claimant’s two operations.
The record evidence proves that claimant’s accident caused an unstable neck and pain and weakness in his arms, but there is no medical evidence to support the deputy’s finding that claimant’s accident caused organic damage to his nervous system. To interpret catastrophic injury as including total loss of use of a limb for a cause other than organic damage to the nervous system “would render superfluous” the specific statutory reference to “organic damage to the nervous system.” Spitzer v. Bartlett Brothers Roofing, 437 So.2d 758, 759 (Fla. 1st DCA 1983); see also E.B. Malone Corporation v. Johnson, 425 So.2d 622, 625 (Fla. 1st DCA 1983).
REVERSED.
SMITH and NIMMONS, JJ., concur.